OWEN A. KLOTER, State Bar No. 034622010
DANIEL SCOTT FURST, *Pro Hac Vice*
SICHENZIA ROSS FERENCE LLP
1185 Avenue of the Americas, 37th Floor
New York, New York 10036
Telephone:      (212) 930-9700
Facsimile:      (212) 930-9725
E-mail:         okloter@srf.law
E-mail:         sfurst@srf.law

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

......................................................................X
                                                     :

FRANK MAZZOLA,                             :    Case No. 2:20-CV-13387 (BRM)
                                                     :    (ESK)

                        Plaintiff,     :

                                              :    **FIRST AMENDED COMPLAINT**

                    vs.              :

                                              :

PRIME EFS, LLC, TRANSPORTATION     :
AND LOGISTICS SYSTEMS, INC., f/k/a     :
PETROTERRA CORP., JOHN               :
MERCADANTE and DOUGLAS CERNY,   :
                                            :

                          Defendants.     :
                                            :
......................................................................X

       Plaintiff Frank Mazzola ("Mazzola" or "Plaintiff"), by and through his attorneys, Sichenzia

Ross Ference LLP, alleges through this First Amended Complaint against defendants Prime EFS,

LLC ("Prime"), Transportation and Logistics Systems, Inc. ("TLS") (f/k/a PetroTerra Corp.

("PetroTerra")), John Mercadante ("Mercadante") and Douglas Cerny ("Cerny") (collectively,

Prime, TLS, PetroTerra, Mercadante and Cerny are the "Defendants") (collectively, Plaintiff and

Defendants are the "Parties") as follows:

1

## PRELIMINARY STATEMENT

1.      On or about June 18, 2018, PetroTerra (now known as TLS) acquired a wholly-owned, operating subsidiary, Prime.  With such acquisition, PetroTerra's Chief Executive Officer and Chairman concurrently caused Prime to enter into a written employment agreement ("Employment Agreement") with Mazzola.

2.      In its subsequent public filings, TLS reported that TLS and Prime are and intend to be collectively responsible for the Employment Agreement. TLS reported that, with respect to the organization and operation of TLS and its wholly-owned subsidiaries, including Prime, the entities had a common business, control and extensive integration of operations and management.

3.      As alleged, Prime is the alter ego or mere instrumentality of its sole member and parent, TLS, and all aspects and manner of its business, operations and revenues are dominated by its single member.  In addition to the control and domination of the business by its single member, the funds and assets of the business and its sole member are commingled and no corporate formalities are respected as between the business and its sole member.  Consequently, for purpose of jurisdiction and liability, the entities have no separate existence.

4.      Under Mazola's stewardship, TLS and Prime benefitted with each remarkable revenue growth milestone that Mazzola achieved.

5.      Mazzola was compensated commensurate with his success, and the relationship was prosperous until Defendants no longer wanted to pay for Mazzola's efforts and success and concluded that the cost of compliance with the contract was "too rich" for their liking.

6.      TLS' two top officers and directors also serve as the top officers and managers of Prime, but without corporate consent or authority, they concocted a separate and distinct plan to deceive Mazzola to not enforce his rights under the Employment Agreement that Prime and TLS had already breached.  They promised him new employment and compensation terms advantageous to him when, in fact, they never had intended to present such terms or to honor such terms when they

2

first presented their fraud to Mazzola. Instead, they duped him into inaction resulting in substantial harm.

## THE PARTIES

7.     Until his termination, Mazzola was the Vice President of Sales at Prime, and a resident of New Jersey.

8.     Prime is a New Jersey limited liability company with a principal place of business located as 212 Washington Avenue, Carlstadt, New Jersey 07072. Prime is in the trucking and transportation business and, as set forth more fully below, Prime is the wholly-owned operating subsidiary of TLS (and its predecessor PetroTerra).

9.     TLS is a publicly-traded, Nevada corporation with a principal place of business located at 5500 Military Trail, Suite 22-357, Jupiter, Florida 33458. TLS is the only member of Prime, is financially dependent on Prime and is the intended third-party beneficiary of the underlying contracts at issue in this Complaint.

10.    According to its public disclosures filed with the United States Securities and Exchange Commission (the "Commission"), TLS is a logistics and transportation companying specializing in "eCommerce fulfillment." TLS operates through its wholly-owned subsidiaries, Prime and non-party Shypdirect LLC, and controls, recognizes and reports the assets, liabilities, revenue and other obligations of Prime and Shypdirect LLC as a single – not separate and distinct – segment in its public filings. According to its public disclosures, TLS and Prime operate in New York, New Jersey, Pennsylvania, Ohio, Tennessee, Georgia and Florida.

11.    On information and belief, non-party Steven Yariv is the former Chief Executive Officer and Chairman of the Board of Directors of TLS (f/k/a PetroTerra) and Prime. Mr. Yariv also was the signatory, on behalf of Prime, to the Employment Agreement entered into on or about June 18, 2018, between Prime and Mazzola, which contract was executed concurrently with the acquisition of Prime by PetroTerra (n/k/a TLS) pursuant to a Stock Purchase Agreement.  Mr.

Yariv executed same on June 18, 2018.

12.     On or about July 18, 2018, PetroTerra announced a reverse split of its common stock and a name change to Transportation and Logistics Systems, Inc.

13.     Since on or about April 16, 2019, Mercadante has been the Chairman of the Board of Directors, Chief Executive Officer, President and Principal Financial Officer of TLS as well as the Chief Executive Officer, President and Manager of Prime.   On information and belief, Mr. Mercadante is a resident of the State of Florida.

14.     Since on or about April 16, 2019, Cerny has been the Chief Development Officer and Director of TLS as well as the Vice President, Secretary of Prime and Manager of Prime. On information and belief, Cerny is a resident of the State of Florida.

15.     On information and belief, non-party Timothy Larkin was the Chief Financial Officer of TLS.

16.     On information and belief, and as set forth more fully herein, Mercadante and Cerny have intentionally caused TLS to: dominate and control every aspect of Prime; disregard the corporate formalities between parent and subsidiary; undercapitalize Prime; cause Prime to apply for Paycheck Protection Program loan  ("PPP loan,") and, upon receipt of such proceeds siphon hundreds of thousands of dollars of Prime operating capital that was already in Prime's accounts out of Prime and into TLS for uses unrelated to Prime; and dishonor Prime's indebtedness and creditors, including Mazzola, at the same time as stripping away all of Prime's revenue and operating capital.

17.     As the highest officers and directors of TLS, the highest officers of its wholly-owned subsidiary, Prime, and the Managers of Prime, the conduct of Mercadante and Cerny are closely related to the contractual relationship at issue in this Complaint, they benefitted from the contractual relationship at issue in this Complaint, and, consequently, they are deemed to be subject to the jurisdiction of this Court.

18.     In addition, as set forth more fully below, Mercadante and Cerny have intentionally

and fraudulently induced Plaintiff to delay and not enforce his contractual rights and remedies under the Employment Agreement against Prime and TLS until TLS had no further use or need of Prime or Plaintiff.

## JURISDICTION AND VENUE

19.     On or about September 1, 2020, Plaintiff commenced an action in the United States District Court of the Southern District of New York, captioned *Frank Mazzola v. Prime EFS, LLC, Transportation and Logistics Systems, Inc. f/k/a PetroTerra Corp., John Mercadante and Douglas Cerny*, Case No. 1:20-cv-05788.

20.     After an initial meeting and conferring with opposing counsel and based on facts then available to all parties, with the Court's consent, Plaintiff voluntarily discontinued the action without prejudice and, on or about August 26, 2020, Plaintiff filed the Complaint in the Superior Court of New Jersey, Bergen County: Law Division, captioned *Frank Mazzola v. Prime EFS, LLC, Transportation and Logistics Systems, Inc. f/k/a PetroTerra Corp., John Mercadante and Douglas Cerny*, Docket No. BER-L-004967-20. A true and correct copy of the Complaint is annexed hereto as **Exhibit 1**.

21.     On or about September 28, 2020, Defendants removed the action to the United States District Court of New Jersey based on diversity jurisdiction pursuant to 28 U.S.C. § 1332 (d). *See* ECF No. 1.

22.     Jurisdiction is proper as there is diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs pursuant to 28 U.S.C. § 1332.

23.     After substitution in of new counsel for all Parties, Plaintiff presented Defendants with a fully-executed copy of the Employment Agreement, which, at Section 9, contains the following forum selection, choice of law and waiver provisions that govern this dispute:

(i) <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with and subject to, the laws of the State of New York applicable to

agreements made and to be performed entirely within such state without regard to its conflicts of law rules.

      (j) <u>Jurisdiction and Venue</u>.

      (i) The Company and Executive hereby irrevocably and unconditionally submit, for themselves and their property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in the City of New York and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment, and the Company and Executive hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. The Company and Executive irrevocably waive, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. The Company and Executive agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Executive agrees not to commence a claim or proceeding hereunder in a court other than a New York State court or federal court located in the City of New York, except if Executive has first brought such claim or proceeding in such New York State court or federal court located in the City of New York, and such court or courts have denied jurisdiction over such claim or proceeding.

      (ii) The Company and Executive irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that they may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State court or federal court of the United States of America sitting in the City of New York and any appellate court from any thereof.

A true and correct copy of the Employment Agreement is annexed hereto as **Exhibit 2**.

    24.    Venue is proper pursuant to 28 U.S.C. § 1391(a) because the event and acts giving rise to the action occurred in the District of New Jersey.[11]

---

[1] On information and belief, prior counsel stipulated and agreed that this action should remain venued in the District Court of New Jersey because: Defendants have conducted business in New Jersey; the conduct at issue occurred in or was directed at New Jersey; the convenience of the Parties and witnesses favors New Jersey; and, therefore, New Jersey has the most significant "local interest" in the subject of the controversy over New York despite that the Employment Agreement provides for exclusive jurisdiction of any dispute in the state or federal courts in New York County, New York.

## GENERAL ALLEGATIONS

25.     On June 18, 2018, PetroTerra, now known as TLS, completed the acquisition of one hundred percent (100%) of the issued and outstanding membership interests of Prime from its members pursuant to the terms and conditions of a Stock Purchase Agreement. A true and correct copy of the Stock Purchase Agreement is annexed hereto as **Exhibit 3**. TLS disclosed the transaction and filed a copy of the Stock Purchase Agreement as Exhibit 10.3 to its Form 8-K filed with the Commission on June 27, 2018.

26.     TLS also simultaneously caused Prime, as its wholly-owned subsidiary, to execute a Security Agreement and Guarantee in favor of its parent company and sole member, TLS, in order to induce a third-party investor to provide financing for, in part, the acquisition of Prime, in the aggregate principal amount of $2,497,502. True and correct copies of the executed Security Agreement and Subsidiary Guarantee are annexed collectively hereto as **Exhibit 4**. TLS disclosed the transaction, including as to the guarantees of the subsidiary (Prime) in favor of the parent company, in its Form 8-K filed with the Commission on June 27, 2018.

27.     As set forth more fully below, from the time of acquisition of Prime, TLS deliberately undercapitalized Prime by saddling it with the financial obligations of its parent and continuously pulling its operating capital up to the parent company despite that the parent had no independent business of its own.

### Prime And TLS Intended And Did Enter Into A
### Valid And Enforceable Contract With Mazzola

28.     As a condition precedent of closing on the acquisition transaction, TLS also

_____

Without waiving any of its other rights under the Employment Agreement, including, but not limited to, choice of law, the undersigned attorneys adhere to the prior agreement of former counsel as to venue.

simultaneously caused Prime to enter into the Employment Agreement with Mazzola, which requirement was expressly stated in Section 5.2 of the Stock Purchase Agreement.

29.     Furthermore, prior to the closing, on June 13, 2018, the Board of Directors of TLS ratified, authorized and approved terms of both the acquisition transaction and Employment Agreement. A true and correct copy of the Written Consent of the Board of Directors of PetroTerra Corp., dated June 13, 2018, is annexed hereto as **Exhibit 5**.

30.     On June 18, 2018, the underlying transaction documents, including the Stock Purchase Agreement and the Employment Agreement (containing Mazzola's signature) were emailed to Prime's corporate attorney, Ali Panjwani, of Pryor Cashman LLP, who was also asked to return Prime's executed signature pages for the Stock Purchase Agreement and Employment Agreement. A true and correct copy of the June 18, 2018 email transmittal together with courtesy copies of the executed Stock Purchase Agreement and Employment Agreement and transmittal email are annexed collectively hereto as **Exhibit 6**.

31.     As required by Section 5.3.1(vii) of the Stock Purchase Agreement, on June 18, 2018, TLS' attorney, Mr. Panjwani, emailed his client's executed signature pages to the Stock Purchase Agreement and Employment Agreement to, among others, Mazzola. A true and correct copy of the June 18, 2018 Prime signature pages to the Stock Purchase Agreement and Employment Agreement are annexed collectively hereto as **Exhibit 7**.

32.     As required by Section 6.2.2 of the Stock Purchase Agreement, following the exchange of executed documents, the transactions closed. A true and correct exchange of emails between attorneys for the parties to the transaction and Mazzola, dated June 18, 2018, acknowledging the successful closing of the transaction, are annexed collectively hereto as **Exhibit 8**.

33.     TLS reported the successful closing of the transaction in its Form 10-Q for the

quarterly period ended June 30, 2018.

34.    In relevant part, the Employment Agreement contains the following terms:

3. <u>Compensation and Benefits</u>. The Company shall pay or provide, as the case may be, to Executive the compensation and other benefits and rights set forth in this Section 3.

(a) <u>Base Salary</u>. The Company shall pay to Executive a base salary of $520,000 per year, payable in accordance with the Company's usual pay practices (and in any event no less frequently than monthly). Executive's base salary will increase by $260,000 per year upon (i) the Company achieving revenue of $20 million on an annualized basis (the "Initial Target Goal") for four consecutive weeks; and (ii) each time the Company achieves revenue of an additional $10 million increment above the Initial Target Goal (i.e., $30 million, $40 million, $50 million, etc.) on an annualized basis for four consecutive weeks. Executive's base salary shall be subject to review annually by the Manager and may be increased (but not decreased).

(b) <u>Annual Bonus</u>. Executive shall be entitled to participate in any bonus plan that the Manager or its designee may approve for the senior executives of the Company. Bonuses shall be paid no later than two and one-half (2 ½) months following the end of the applicable year.

(c)    <u>Benefits</u>. Executive shall be entitled to participate in benefits under the Company's benefit plans, profit sharing and arrangements, including, without limitation, any employee benefit plan or arrangement made available in the future by the Company to its employees or senior executives, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements. The Company shall have the right to amend or delete any such benefit plan or arrangement made available by the Company to its employees or senior executives and not otherwise specifically provided for herein. Notwithstanding the foregoing, during the Employment Term (as hereinafter defined), the Company will provide, at the Company's expense, health and major medical insurance benefits to the Executive and his family members which are at least equal to the benefits provided to the Executive and his family members immediately prior to the Effective Date.

(d) <u>Expenses</u>. The Company shall promptly reimburse Executive for reasonable out-of-pocket business expenses incurred in connection with the performance of his duties hereunder, subject to (i) such policies as the Company may from time to time establish, (ii) Executive furnishing the Company with evidence in the form of receipts satisfactory to the Company substantiating the claimed expenditures, and (iii) Executive receiving advance approval from the President or Chief Executive Officer in the case of expenses (or a series of related expenses) in excess of $10,000.

(e) <u>Vacation</u>. Executive shall have the right to four weeks of vacation during each successive one year period of his employment by the Company, which

vacation time shall be taken at such time or times in each such one year period so as not to materially and adversely interfere with the performance of his responsibilities under this Agreement. Executive shall not be entitled to carry over any unused vacation time from one year to the next and any accrued but unused vacation time will be waived. In addition, Executive shall be entitled to additional paid time off in accordance with the policies of the Company applicable to senior management personnel from time to time.

(g) Equity Awards. Executive shall be entitled to participate in any equity or other employee benefit plan that is generally available to senior executive officers, as distinguished from general management, of the Company or PetroTerra. Except as otherwise provided in this Agreement, Executive's participation in and benefits under any such plan shall be on the terms and subject to the conditions specified in the governing document of the particular plan.

(h) Automobile. Executive shall be entitled to the full-time use of an automobile owned or leased by the Company, at least equal to the automobile provided to the Executive immediately prior to the Effective Date. In addition, the Company shall reimburse Executive for all maintenance and gasoline expenses associated with the automobile, provided that such expenses are adequately documented.

(i) Life Insurance. During the Employment Term, the Company will provide, at the Company's expense, a life insurance policy, for the benefit of the Executive and his beneficiaries, at least equal to the life insurance policy provided to the Executive and his beneficiaries immediately prior to the Effective Date.

4. Employment Term. The term of this Agreement (as it may be extended by the following sentence or terminated earlier pursuant to Section 5, the "Employment Term") shall begin on the Effective Date and end on the close of business on May 31, 2023. The Employment Term shall be automatically extended for additional one-year periods unless, at least sixty (60) days prior to the end of the expiration of the Employment Term, Executive or the Company notifies the other party in writing (a "Non-Renewal Notice") that it does not wish to extend such Employment Term. Executive's employment hereunder shall be coterminous with the Employment Term, unless sooner terminated as provided in Section 5.

5. Termination; Severance. Executive shall be entitled to receive benefits upon a Separation from Service only as set forth in this Section 5:

(a) General. Either the Company or Executive may terminate Executive's employment hereunder, for any reason, at any time prior to the expiration of the Employment Term, upon thirty (30) days prior written notice to the other party. Upon termination of Executive's employment hereunder for any reason, Executive shall be deemed simultaneously to have resigned from any position or office he may at the time hold with the Company or any of its affiliates. In addition, upon expiration of the Employment Term, the Company shall (i) reimburse Executive for any expenses properly incurred under Section 3(d) and which have not previously been reimbursed as of the effective date of the termination, (ii) pay

10

Executive for any accrued, but unused, vacation time as of the effective date of the termination, (iii) pay Executive for any accrued and unpaid base salary through and including the effective date of termination, and (iv) pay Executive any earned by not paid bonus for the year prior to the year in which the effective date of termination occurs (collectively, the "Accrued Compensation"). The Accrued Compensation will be paid in a lump sum on the first regularly scheduled payroll date following the effective date of the termination of Executive's employment with the Company, except that any earned by unpaid bonus will be made at the time such bonuses are paid to senior executives generally but no later than two and one-half (2 ½) months after the end of the year to which the bonus relates.

(c) Severance upon Involuntary Termination. Subject to Sections 5(e) and 10(p) and Executive's continued compliance with Section 6, if Executive's employment is Involuntarily Terminated, Executive shall be entitled to receive, in lieu of any severance benefits to which Executive may otherwise be entitled under any severance plan or program of the Company, the benefits provided below, which, with respect to clause (ii) and the last sentence of clause (iii) (if applicable) will be payable in a lump sum within ten (10) days following the effective date of Executive's Release (as hereinafter defined):

(i) the Company shall pay to Executive his fully earned but unpaid base salary, when due, through the date of Executive's Involuntary Termination at the rate then in effect (without regard to any reduction in salary that gave rise to an event of Good Reason), plus all other benefits, if any, under any Company group retirement plan, nonqualified deferred compensation plan, equity award plan or agreement, health benefits plan or other Company group benefit plan to which Executive may be entitled pursuant to the terms of such plans or agreements at the time of Executive's Involuntary Termination;

(ii) Executive shall be entitled to receive severance pay in an amount equal to the base salary payable to Executive under Section 3(a) of this Agreement from the date of Executive's Involuntary Termination until the one year anniversary of such Involuntary Termination (the "Severance Period");

(iii) During the Severance Period (or, if earlier, until the date on which the applicable continuation period under COBRA expires), the Company shall arrange to provide Executive and his eligible dependents who were covered under the Company's health insurance plans as of the date of Executive's Involuntary Termination with health (including medical, dental and vision) insurance benefits substantially similar to those provided to Executive and his dependents immediately prior to the date of such involuntary Termination. If any of the Company's health benefits are self-funded as of the date of Executive's Involuntary Termination, or if the Company cannot provide the foregoing benefits in a manner that is exempt from Section 409A (as defined below) or that is otherwise

11

compliant with applicable law (including, without limitation, Section 2716 of the Public Health Service Act), instead of providing continued health insurance benefits as set forth above, the Company shall instead pay to Executive an amount equal to (A) the number of months from the date of Executive's Involuntary Termination until the end of the Employment Term, as appropriate multiplied by (B) the monthly premium Executive would be required to pay for continuation coverage pursuant to COBRA for Executive and his eligible dependents who were covered under the Company's health plans as of the date of Executive's Involuntary Termination (calculated by reference to the premium as of the date of Involuntary Termination); and

(iv) That portion of the Stock Awards that would have vested over the Severance Period shall be automatically accelerated so as to be immediately vested as of the date of Involuntary Termination and any vested options or similar award (e.g., a stock appreciation right) may be exercised at any time during the Severance Period (subject to earlier termination (A) in connection with a recapitalization or similar transaction pursuant to the Company's equity incentive plans governing such Stock Awards or (B) the contractual term of the Stock Award), or if longer, through the date such vested options or similar award are exercisable under the terms of the applicable Stock Award.

(g) <u>No Mitigation</u>. Executive shall not be required to mitigate the amount of any payment provided for in this Section 5 by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this Section 5 be reduced by any compensation earned by Executive as the result of employment by another employer or self-employment or by retirement benefits; provided, however, that loans, advances or other amounts owed by Executive to the Company may be offset by the Company against amounts payable to Executive under this Section 5.

9. <u>Miscellaneous</u>.

(a) <u>Modification; Prior Claims</u>. This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, supersedes all existing agreements between them concerning such subject matter, including, without limitation, the consulting Agreement. For the sake of clarity, any Stock Awards agreements to which h the Company and Executive are bound on the date hereof shall remain in effect in accordance with their respective terms, except as modified by Section 5. This Agreement may be amended or modified only with the written consent of Executive and an authorized representative of the Company. No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

*See* **Exhibit 2**.

35. On or about August 19, 2019, TLS filed with the Commission a Form 10-Q for the quarterly period ended June 30, 2019, which confirmed that the parent company – TLS – had intended to be bound and was bound to the Employment Agreement between its wholly-owned operating subsidiary, Prime, and Mr. Mazzola as follows:

> On June 18, 2018, the Company entered into an employment agreement with the chief operating officer of Prime. The Company shall pay to this executive a base salary of $520,000 per year, payable in accordance with the Company's usual pay practices. The executive's base salary will increase by $260,000 per year upon (i) Prime achieving revenue of $20 million on an annualized basis (the "Initial Target Goal") for four consecutive weeks; and (ii) each time Prime achieves revenue of an additional $10 million increment above the Initial Target Goal (i.e., $30 million, $40 million, $50 million, etc.) on an annualized basis for four consecutive weeks. Executive's base salary shall be subject to review annually by the Manager and may be increased (but not decreased). The executive shall be entitled to participate in any bonus plan that the Manager or its designee may approve for the senior executives of the Company and shall be entitled to participate in benefits under the Company's benefit plans, profit sharing and arrangements, including, without limitation, any employee benefit plan or arrangement made available in the future by the Company to its employees or senior executives, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements. Notwithstanding the foregoing, during the Employment, the Company will provide, at the Company's expense, health and major medical insurance benefits to the Executive and his family members which are at least equal to the benefits provided to the Executive and his family members immediately prior to the Effective Date. The term of this Agreement (as it may be extended by the following sentence or terminated earlier pursuant to terms in the employment agreement shall begin on the Effective Date and end on the close of business on May 31, 2023. The Employment Term shall be automatically extended for additional one-year periods unless, at least sixty (60) days prior to the end of the expiration of the Employment Term.

A true and correct excerpted copy of the relevant pages of the Form 10-Q is annexed hereto as **Exhibit 9**.

36. The Form 10-Q sets forth that TLS and Prime are and intend to be collectively responsible for the Employment Agreement, and the filing was signed by Mercadante, as Chief Executive Officer, Chief Financial Officer, President and Director of TLS, and by Cerny, as Director of TLS.

37.     The Form 10-Q for the quarterly period ended June 30, 2019 also discloses that, with respect to the organization and operation of TLS and its wholly-owned subsidiaries, including Prime, TLS enters into service agreements for the delivery of packages and "believes that it operates in one operating segment related to deliveries for on-line retailers in New York, New Jersey and Pennsylvania and tractor trailer and box truck deliveries of product on the east coast of the United States from one distributor's warehouse to another warehouse or from a distributor's warehouse to the post office." Plaintiff respectfully refers the Court to Exhibit 9.

### Mazzola Performed All Of His Contractual Obligations And Prime And TLS Were Enriched For It

38.   Mazzola performed all of his obligations under the Employment Agreement, and consistent therewith, he was paid a weekly gross salary of $10,000.00 or an annualized salary of $520,000.00.   A true and correct sampling Mazzola's June and July 2018 weekly earnings statements are annexed collectively hereto as **Exhibit 10**.

39.   Prime and TLS enjoyed significant revenue growth during Mazzola's tenure, and Mazzola's weekly gross salary increased from $10,000.00 to $15,000.00 or an annualized salary increase from $520,000.00 to $780,000.00 in conjunction with TLS "achieving revenue of $20 million on an annualized basis . . . for four consecutive weeks[.]"

40.   By the end of 2019, under the stewardship of Mazzola, Prime also achieved annualized revenue of or in excess of $30 million, which obligated TLS and Prime to increase in Mazzola's base salary from $780,000.00 to $1,040,000.00, pursuant to Section 3(a) of the Employment Agreement.

41.   Indeed, on or about April 2, 2019, Cerny sent an email from Florida to New Jersey, using his doug@primeefs.com domain email address, which was directed to Plaintiff and copied to TLS' former Chief Executive Officer and Chairman, Steve Yariv, as well as Mercadante, which identified annual salaries of critical "officers and key personnel at TLS/Prime EFS." As of April

2, 2019, Plaintiff's salary was reported as $950,000.00. *None* of the recipients of this email disputed Plaintiff's annualized salary.

42.   TLS' public filings with the Commission corroborate the annualized revenue achievements of Prime under Mazzola's stewardship.

43.   On or about May 17, 2019, TLS filed with the Commission a Form 10-Q for the quarter ended March 31, 2019, which reported revenue of $5,396,060.00 for the quarter. This equals revenue of approximately $21.6 million on an annualized basis. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 11**.

44.   On or about August 19, 2019, TLS filed with the Commission a Form 10-Q for the quarter ended June 30, 2019, which reported revenue of $13,904,619.00 for the six-month period. As set forth therein at "Note 13 – Concentration," 99.1% of that revenue was attributable to a Prime customer. Plaintiff respectfully refers the Court to Exhibit 9.

45.   Therefore, Prime met its annualized revenue growth metric of $20 million (as set forth in Section 3(a) of the Employment Agreement) at three (3) months and accelerated revenue at six (6) months. This equals revenue of approximately $21.6 million on an annualized basis. Plaintiff refers the Court to **Exhibit 9**.

46.   On or about November 19, 2019, TLS filed with the Commissions a Form 10-Q for the quarter ended September 30, 2019. For the nine (9) month period ended September 30, 2019, TLS reported revenue of $21,664,070.00. As set forth therein at "Note 13 – Concentration," 99.1% of that revenue was attributable to a Prime customer, which percentage equals $21,469,093.00. Therefore, for three (3) consecutive quarters, Prime's annualized revenue was or exceeded $20 million, and Mazzola's annualized salary increased from $520,000.00 to $780,000.00. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 12**.

47.   On or about May 29, 2020, TLS filed with the Commission a Form 10-K for the fiscal

year ended December 31, 2019, which, as it had disclosed in its earlier Form 10-Q filing for the quarterly period ending June 30, 2019, again confirmed that the parent company – TLS – and wholly-owned subsidiary – Prime – are bound and intend to be bound to the Employment Agreement with Mazzola. A true and correct excerpted copy of the relevant pages of the Form 10-K are annexed hereto as **Exhibit 13**.

48.    According to its Form 10-K for the fiscal year ended December 31, 2019, TLS reported revenue of $31,356,251.00. As set forth therein at "Note 16 – Concentrations," "[f]or the years ended December 31, 2019 and 2018, one customer represented 98.7% and 99.0% of the Company's total net revenues." As set forth therein at "Note 16 – Concentrations," 98.7% of that revenue was attributable to a Prime customer, which percentage equals $30,948,620 in annualized revenue for 2019. Therefore, Prime's annualized revenue was or exceeded $30 million, and Mazzola's annualized salary increased from $1,040,000.00.

49.    On or about June 29, 2020, TLS filed with the Commissions a Form 10-Q for the quarter ended March 31, 2020, which reported revenue of $8,635,060.00 for the quarter. As set forth therein at "Note 12 – Concentration," "[f]or the three months ended March 31, 2020 and 2019, one customer, Amazon, represented 97.9% and 99.0% of the Company's total net revenues," which 97.9% percentage equals $8,453,724.00 in revenue. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 14**.

50.    On or about August 14, 2020, TLS filed with the Commission a Form 10-Q for the quarter ended June 30, 2020, which reported revenue of $17,193,875.00 for the six-month period. As set forth therein at "Note 12 – Concentration," "[f]or the six months ended June 30, 2020 and 2019, one customer, Amazon, represented 98.7% and 99.1% of the Company's total net revenues," which 98.7% percentage equals $16,970,355.00. Therefore, for a third, consecutive quarter, Prime's annualized revenue was or exceeded $30 million, and Mazzola's annualized salary level,

pursuant to Section 3(a) of the Employment Agreement, was $1,040,000.00. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 15**.

### The Contract Is Breached And Mercadante
### <u>And Cerny Commit Fraud</u>

51.    Section 9(a) of the Employment Agreement provides that, "[t]his Agreement may be amended or modified only with the written consent of Executive and an authorized representative of the Company. No oral waiver, amendment or modification will be effective under any circumstances whatsoever." Plaintiff respectfully refers the Court to Exhibit 2.

52.    Notwithstanding Prime's revenue growth, Mercadante and Cerny decided that Mazzola's outstanding success and commensurate compensation, which exceeded their own, was "too rich" and had to be cut despite that the Employment Agreement was approved by Mercadante's predecessor and TLS' Board of Directors.

53.    In contravention of TLS' prior and repeated acknowledgments in its public filings that TLS and Prime are and intend to be bound to the Employment Agreement, and without the authority and approval of Mazzola, Mercadante and Cerny caused TLS and Prime to dramatically cut Mazzola's compensation starting in May 2019.

54.    Importantly, Mazzola did not approve, waive or ratify Defendants' unilateral acts in violation of the Employment Agreement.

55.    To the contrary, Mazzola protested and objected to the patent breach of his compensation terms and threatened to take action to protect his rights under the Employment Agreement.

56.    In response, starting in or around March 2019, Mercadante and Cerny initiated or participated in multiple discussions and communications with Mazzola wherein each materially misrepresented facts and deceived Mazzola as to the nature of his compensation cuts, the amount of the cuts and the duration of the cuts.

17

57.    In the spirit of possible compromise and cooperation, Mazzola endeavored to discuss amendments to the Employment Agreement to offset or mitigate the adverse impact of the compensation cuts enacted by Defendants.

58.    Although TLS and Prime continued to unlawfully withhold Mazzola's base salary that was increasing as he achieved revenue growth milestones, Mercadante and Cerny repeatedly advised Mazzola that they would present his new terms of employment and compensation, but their representations as to the existence of such a document were hollow.

59.    Aware of the actions taken by TLS and Prime at the behest of Mercadante and Cerny, TLS' accountants advised them (and Mazzola) that, for accounting purposes, if the parties wishes to amend the Employment Agreement and reduce Mazzola's salary compensation, the accounting firm required that TLS or Prime produce an amended employment agreement.

60.    TLS, Prime, Mercadante and Cerny never produced an amended employment agreement (much less one signed by the parties and compliant with Section 9(a) of the Employment Agreement), because none exists.

61.    With no recourse and no contra-party to explore the actual terms and conditions that Mercadante and Cerny favored, Mazzola continued to perform his obligations under the Employment Agreement and to demand that Mercadante and Cerny comply with their repeated promises to present the amended employment terms to Mazzola.

62.    Despite that Prime reported gross revenue of $16,970,355.00 in the first six months of 2020, on or about April 27, 2020, TLS filed a Form 8-K with the Commission, which disclosed that, on April 8, 2020, Prime also had applied for a loan available under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief and Economic Security Act of 2020 (the "CARES Act").

63.    Section Q of that promissory note provides:

Q. Representations and Warranties. Borrower represents and warrants to, and with regard to item (a) the individual executing this Note also represents and warrants, in his/her individual capacity, to, and covenants with Lender as follows: (a) the individual executing this Note is duly authorized to do so and to bind Borrower and Borrower's heirs, successors and/or assigns to the terms hereof; (b) each of the Loan Documents is a valid and legal binding obligation of Borrower, enforceable in accordance with its terms, and is not subject to any defenses, counterclaims, or offsets of any kind; (c) **there exists no action, suit, proceeding or investigation, at law or in equity, before any court board, administrative body or other entity, pending or threatened, affecting Borrower's property, wherein an unfavorable decision, ruling or finding would materially adversely affect the business operations, property or financial condition of Borrower**; (d) Borrower shall advise Lender if there is an adverse change in Borrower's financial condition, organization, operations or fixed assets since the date this Note is signed[.]

(emphasis added.)

64.   Mercadante signed and secured the repayment obligation on the PPP loan with a promissory note in which he indicated that he was the "Authorized Representative" of Prime and listed his address as 212 Washington Avenue, Carlstadt, New Jersey 070772. A true and correct copy of the PPP loan note is annexed hereto as **Exhibit 16**.

65.   Weeks later, Mercadante signed and certified TLS' Form 10-Q filing with the Commission, for the quarter ended June 30, 2020, in which TLS disclosed five (5) separate lawsuits against TLS and Prime that could materially adversely affect the business operations, property or financial condition of Prime, to wit: (i) *Elrac LLC v. Prime EFS*, filed on January 10, 2020, in the United States District Court for the Eastern District of New York and assigned Case No. 1:20-cv-00211, which seeks damages of approximately $622,000.00; (ii) breach of a settlement agreement, captioned as *BMF Capital v. Prime EFS LLC et al.*, and as to which Prime has valued its potential liability at $10,000.00; (iii) *Bellridge Capital, L.P. and SCS, LLC v. TLS*, in which investors seek approximately $1,978,557.76 - $2,271,099.83 based on TLS' breach of various agreements; (iv) *SCS, LLC v. Transport and Logistics Systems, Inc.*, filed on May 26, 2020, in the New York State Supreme Court, County of New York, and assigned Index No. 154433/2020, which seeks damages of $42,000.00; and (v) *SCS, LLC, derivatively on behalf of Transportation*

19

*and Logistics Systems, Inc. v. John Mercadante, Jr., Douglas Cerny, Sebastian Giordano, Ascentaur LLC and Transportation and Logistics Systems, Inc.*, in the 5th Judicial Circuit in and for Palm Beach County, Florida and assigned Case No. 2020-CA-006581, which seeks unspecified damages on behalf of investors for breach of fiduciary duties against the defendants, among other claims.

66.   On April 22, 2020, Prime received $2,941,212.50 in PPP loan proceeds.

67.   Although Mercadante caused Prime to deploy some portion of the PPP loan proceeds for its payroll obligations, he also ordered Prime, which was now flush with operating capital, to make multiple wire transfers out of its operating account to TLS' corporate account in an aggregate amount believed, on information and belief, to total hundreds of thousands of dollars of Prime funds, thereby stripping critical operating capital out of Prime.  These monies - assets of Prime – were wired as directed and conveyed to Prime's sole member without consideration to Prime.

68.   On information and belief, this exodus of operating capital from subsidiary to parent company were then used by TLS to pay TLS' creditors and other debts.

69.   Despite coaxing Mazzola not to enforce his rights under the Employment Agreement with a (false) promise of a new agreement containing new terms of employment and compensation, Mercadante and Cerny never intended to do so.  Indeed, as later confirmed in TLS' own public filings, TLS took the position that Mazzola never had any employment agreement with Prime, and, therefore, TLS and Prime never had any obligations to Mazzola.   In other words, the misrepresentations of Mercadante and Cerny were premised upon an event they knew to be untrue when they first started communicating to Mazzola.

70.   On June 24, 2020, Mazzola's employment was unlawfully terminated.

71.   At the time of his termination, TLS had directed Prime to cut Mazzola's annualized salary from $1,040,000.00 to $350,000.00. As of his termination date, $759,038.41 of accrued

salary was still unpaid and overdue.

72.   Prior to terminating Mazzola, neither TLS nor Prime allocated or applied any of the PPP loan proceeds to pay the accrued salary owed to Mazzola.

73.   On information and belief, at the behest of and under the absolute control of Mercadante, TLS disregarded the corporate form of Prime and used it to perpetrate an unlawful act in which millions of dollar of operating capital (proportionate to the PPP loan proceeds Prime had received) were unlawfully wrenched out of Prime leaving it undercapitalized and unable to pay Plaintiff and others, because TLS had sheltered such diverted assets at the parent corporate level.

74.   On or about November 16, 2020, TLS filed with the Commission a Form 10-Q for the quarter ended September 30, 2020, which reported third quarter revenue of $6,309,509.00. A true and correct copy of the excerpted Form 10-Q is annexed hereto as **Exhibit 17**.

75.   Despite its millions of dollars in quarterly revenue and its multi-million dollar PPP loan, on or about October 12, 2020, Prime notified some creditors that it had no revenue, and, therefore, it had terminated all of its operations effective September 30, 2020. A true and correct copy of the notice dated October 12, 2020 is annexed hereto as **Exhibit 18**.

76.   On information and belief, TLS completely dominated every aspect of the operations and management of its wholly-owned subsidiary, Prime, and used its subsidiary like a personal "piggy bank" for harvesting revenue.

77.   Neither TLS nor Prime made any payments or otherwise provided any of the non- cash benefits due to Mazzola under the Employment Agreement.

78.   Tellingly, at or around the same time that TLS caused Prime to shutter, TLS formed a new, wholly-owned subsidiary, titled TLS Acquisition, Inc., in order to acquire Cougar Express, Inc. ("Cougar") for approximately $2,350,000.00.

79. Like Prime, Cougar also provides delivery, pick-up and warehousing services throughout New York, New Jersey and Connecticut. Unlike Prime, however, Cougar has not yet been saddled with the debts or legal liabilities of Prime or its member.

80. Presumably, TLS and Prime contend that their payment of Mazzola's initial annualized salary of $520,000.00 (as set forth in Section 3(a) of the Employment Agreement), payment of his increased annualized salary of $780,000.00 (upon his satisfying his revenue milestones under Section 3(a) of the Employment Agreement), and acceptance of his work and efforts to achieve $30 million in annualized revenue by the end of 2019 (entitling him to another annualized salary increase to $1,040,000.00), was gratuitous – *not* because of their contractual obligation.

81. This of course is false, because the execution of and entry into the Employment Agreement was a condition *precedent* to TLS (formerly PetroTerra) simultaneously executing the Stock Purchase Agreement and acquiring Prime.

82. In fact, Mercadante and Cerny had no intention of presenting Mazzola with amended terms and compensation of employment at the time they made the misrepresentation to him. Indeed, Mercadante and Cerny caused TLS and Prime to *deny* (and to falsely report in TLS' public filings) that there was ever a valid and enforceable Employment Agreement with Mazzola to begin with. Consequently, they had no intention of causing the entities that they ran to amend any employment terms, because, they alleged, no original, binding terms every existed.

83. Mercadante and Cerny secretly intended to force TLS and Prime (and the employees of Prime) to disavow all of the obligations owed to Mazzola, to pacify Mazzola with oral and written misrepresentations that Mercadante and Cerny would restructure Mazzola's employment contract if he would hold-off on enforcing his rights under the Employment Agreement.

84. To date, TLS and Prime, which collectively acknowledged and agreed to their

22

obligations to Mazzola, have failed and refused to pay Mazzola his compensation and benefits due under the express terms of the Employment Agreement, including: $1,040,000.00 in annualized salary representing severance under Section 5 of the Employment Agreement; approximately $759,038.41, which represents accrued but unpaid salary under Section 3(a) of the Employment Agreement through the date of termination; and all non-cash benefits and services under Sections 3(b)-(i) of the Employment Agreement.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Breach of Contract – Prime)

85.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.    Plaintiff and Prime entered into a valid and binding contract – specifically the Employment Agreement.

87.    Plaintiff performed any and all conditions precedent and obligations for which he is seeking payment under the Employment Agreement.

88.    Prime is indebted to Plaintiff, pursuant at least to Sections 3, 4 and 5 of the Employment Agreement, in an amount to be determined at trial, but believed to be not less than approximately

$2,000,000.00.

89.    Although Plaintiff has demanded payment of Prime, Prime has failed and refused to pay.

90.    Plaintiff has been damaged by Prime's non-payment.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Piercing the Corporate Veil – TLS)

91.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set

forth herein.

92.    Prime is the wholly-owned, operating subsidiary of TLS.

93.    At all relevant times, TLS utilized Prime as the operating branch and primary revenue source in order to shield TLS from liability.

94.    As set forth above and more fully below, Prime is the alter ego of its sole member, TLS, and Prime was dominated and used by TLS to perpetrate certain unlawful acts and to evade liability.

95.    At all relevant times, Prime generated significant and accelerated revenue growth under the stewardship on Mazzola, but Prime was grossly undercapitalized, was forced by TLS to secure and guarantee certain also and indebtedness incurred by TLS, and was frequently caused to transfer all or a substantial portion of its operating capital to TLS at the mere request of officers and directors of TLS.

96.    At all relevant times, Mercadante was the Chief Executive Officer, Chief Financial Officer, President and Chairman of the Board of Directors or otherwise employed in a position of control within TLS. Prime employees were, at times, directly controlled by Mercadante or other officers of directors or TLS.

97.    TLS exerted such complete control over Prime that the subsidiary was a mere conduit of its sole member, and was used for the purpose of shielding the parent company from liabilities born, in part, from the parent harvesting all of the assets.

98.    As set forth more fully herein, Prime was an instrumentality of TLS, and was utilized by TLS and officers and directors who dominated and controlled TLS, to perpetrate unlawful, unjust and fraudulent actions.

99.    Mazzola is entitled to pierce the corporate veil of Prime, and to collect any judgment levied against Prime from its sole member, TLS.

24

100.  As set forth in the Form 10-Qs and 10-Ks of TLS, TLS and Prime are and intend to be collectively responsible for the Employment Agreement, which filings were signed by Mercadante.

101.  As set forth in the Forms 10-Q of TLS, through its wholly-owned subsidiary, TLS enters into service agreements for the delivery of packages and "operates in one operating segment related to deliveries for on-line retailers in New York, New Jersey and Pennsylvania" not as separate and distinct lines of business.

102.  In other words, TLS' public disclosures and filings with the Commission are unequivocal that as between TLS and its subsidiary, there exists a common business, control and extensive integration of operations and management of the enterprise.

103.  Prime took all managerial and operational directions from Mercadante and Cerny.

104.  Under Mercadante and Cerny, TLS did not observe corporate formalities; rather, TLS regularly directed officers of Prime to transfer funds out of Prime to TLS, to comingle assets or to make payments to third-party creditors on behalf of TLS – *not* Prime.

105.  TLS treated Prime as its "piggy bank."

106.  For example, on September 1, 2018, TLS' attorney at Pryor Cashman LLP, located in New York, sent an email to TLS' former Chief Executive Officer, President and Chairman, Steven Yariv, located in Florida, requesting a payment of TLS to reduce its indebtedness to Pryor Cashman LLP, which was approximately $30,000.00, for services rendered on behalf of TLS relating to its purchase of Prime.  That same day, Yariv emailed TLS' attorney indicating that he had directed Prime to make payment and would direct Prime to make another payment on behalf of TLS.  Prime did so without consideration to Prime.

107.  By way of further example, in or around April 2019, Mercadante sent emails from Florida to New Jersey ordering Prime's Chief Financial Officers to wire $30,000.00 to

Mercadante's personal checking account and $30,000.00 to Cerny's personal checking account. Neither Mercadante nor Cerny provided any explanation or justification for the personal wires of Prime's operating capital.  The payments of Prime's operating assets were wired as directed and conveyed without consideration to Prime.

108.  By way of further example, on or about May 1, 2019, Prime's Chief Financial Officer sent an email from his New Jersey to Messrs. Cerny and Mercadante in Florida at their respective @primeefs.com email domain addresses, with the cash reconciliation of Prime for the month ended April 30, 2019, which disclosed, among other payments of operating capital from Prime's account, payments on (i) April 12, 2019 of $60,000.00 to Messrs. Mercadante and Cerny; (ii) April 18, 2019 of $110,000.00 to a third party investor, Red Diamond Partners, LLC, for a financing between it and TLS; (iii) April 19 and 26, 2019 for a total of $200,000.00 to a third party investor, Bellridge Capital, LP, for a financing between it and TLS; and (iv) April 23, 2019 of $220,000.00 to a family member of TLS' former Chief Executive Officer and Chairman, Steven Yariv.  These payment were made as directed and without consideration to Prime.

109.  By way of further example, on or about May 2, 2019, TLS' Chief Financial Officer at the time, Michael Grennan, sent an email to Prime's Chief Financial Officer directing him to pay TLS's accountants and SEC auditors, Salberg & Company, P.A., $66,955.65 for an audit of TLS for the year ended December 31, 2018, pursuant to an engagement between Salberg & Company, P.A. and TLS, which was executed by TLS' former Chief Executive Officer and Chairman, Steven Yariv. The payment was wired as directed and without consideration to Prime.

110.  By way of further example, on or about September 4, 2019, Cerny sent an email from Florida to New Jersey, using his doug@primeefs.com email domain address, ordering Prime's Chief Financial Officer to wire $150,000.00 from Prime's account to TLS' account.  Mercadante was copied on his Prime email address, john@primeefs.com.  Neither Cerny nor Mercadante

provided any explanation or justification for ordering the subsidiary to wire its operating capital to the parent company. The payment was wired as directed and conveyed without consideration to Prime.

111.  By way of further example, on or about September 4, 2019, Cerny sent an email from Florida to New Jersey, using his doug@primeefs.com email domain address, ordering Prime's Chief Financial Officer to turn over his Prime bank account login and password to TLS' Chief Financial Officer, which directive was followed by Prime's officer.  In so doing, TLS violated any assemblance of an arm's length relationship between the member (TLS) and company (Prime) by not maintaining bona fide separate bank accounts and bookkeeping.

112.  By way of further example, on or about September 5, 2019, Cerny sent an email from Florida to New Jersey, using his doug@primeefs.com email domain address, ordering Prime's Chief Financial Officer to provide TLS' Chief Financial Officer with wire instructions so that TLS could send wires to two individuals in the combined amount of $34,218.00 and instructed Prime's Chief Financial Officer to thereafter reimburse TLS' corporate account from Prime's account for the $34,218.00 in wires.  The payment was wired as directed and conveyed without consideration to Prime.

113.  By way of further example, on or about October 24, 2019, Mercadante ordered Prime's Chief Financial Officer to wire a $5,000.00 payment from its operating account to pay for a private placement engagement agreement entered into between TLS and WestPark Capital, Inc. ("WestPark"), a FINRA registered broker-dealer, pursuant to which WestPark would act as placement agent for TLS and assist it in a private offering of its securities.  The engagement agreement was signed by Mercadante as chief executive officer of TLS.  The payment was wired as directed by Mercadante from Prime's assets and conveyed without consideration to Prime.

114.  By way of further example, on or about November 1, 2019, Mercadante sent an email

from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime to wire a $25,000.00 payment from Prime to a third-party investor, Bellridge Capital, LP, that had provided financing to TLS for, in part, its acquisition of Prime (the repayment of which TLS also made Prime guarantee). The payment drawn on Prime's account was wired as directed and conveyed without consideration to Prime.

115. By way of further example, on or about November 15, 2019, Mercadante sent an email from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime's Chief Financial Officer to wire $28,000.00 to an M & T Bank account without any explanation or justification for Prime doing so without any consideration. The payment was wired from Prime as directed by Mercadante.

116. By way of further example, on or about November 18, 2019, Mercadante sent an email from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime's Chief Financial Officer to wire to wire a $53,000.00 payment from Prime's operating account to TLS's accountants and SEC auditors, Salberg & Company, P.A., for audit-related consulting on TLS' Form S-1. The payment was wired from Prime as directed and conveyed without consideration to Prime.

117. By way of further example, on or about November 20, 2019, Cerny sent an email from Florida to third parties located within New Jersey, using his doug@primeefs.com email domain address and which copied Mercadante at his john@primeefs.com email domain address, to raise $25,000.00 for TLS secured by a promissory note signed by Mercadante as Chief Executive Officer of TLS. The third parties in New Jersey provided an initial $25,000.00 financing to TLS on or about November 21, 2019 and an additional, similarly-secured financing to TLS of $27,500.00 also on November 21, 2019, for a total of $52,500.00.

118. By way of further example, on January 7, 2020 and January 9, 2020, Cerny sent

follow-up emails from Florida to the third party located within New Jersey, using his doug@primeefs.com email domain address and which copied Mercadante at his john@primeefs.com email domain address, promising to wire payment of $52,500.00 to the third-parties in New Jersey to extinguish the payment obligations secured by TLS' promissory notes.

119.  Although the financing was provided to TLS, Mercadante and Cerny ordered Prime's bookkeeper to repay the third-parties in New Jersey from Prime's operating funds the amounts of $25,000.00, on January 14, 2020, and $27,500.00, on January 16, 2020.  The payments were made by Prime as directed by TLS and without consideration to Prime.

120.  By way of further example, on or about December 13, 2019 and January 28, 2020, Mercadante sent emails from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime's Chief Financial Officer to wire operating capital from Prime's account to a third party consultant, Mark Adams, in the amounts of $10,000.00, pursuant to a written consulting agreement between his consultancy and TLS, for facilitating a transaction in which an investor engaged in a financing with TLS for payment. The payment was wired from Prime as directed and conveyed without consideration to Prime.

121.  TLS caused Prime to make additional payments to this consultant, from Prime's operating account, again without any consideration to Prime, totaling approximately $50,000.00.

122.  By way of further example, on or about January 6, 2020, Mercadante sent an email from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime's Chief Financial Officer to make a $25,000.00 payment from Prime to a third-party investor, Bellridge Capital, LP,  that had provided financing to TLS. The payment drawn from Prime's account was wired as directed and conveyed without consideration to Prime.

123.  By way of further example, on or about January 6, 2020, Cerny sent an email from Florida to New Jersey, using his doug@primeefs.com email domain address, ordering Prime's

Chief Financial Officer to wire to TLS' corporate account $239,000.00. Mercadante was copied on the email, at his john@primeefs.com email domain address. Neither Cerny nor Mercadante provided any explanation or justification for ordering the subsidiary to wire its operating capital to the parent company without any consideration to Prime. The payment was wired as directed and without consideration to Prime.

124. By way of further example, on or about January 9, 2020, Mercadante sent an email from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Plaintiff to cause Prime to wire its capital to TLS's accountants and SEC auditors, Salberg & Company, P.A., $40,000.00 for an audit of TLS for the year ended December 31, 2019, pursuant to an engagement letter, dated January 7, 2020, between Salberg & Company, P.A. and TLS.  The payment was wired as directed and without consideration to Prime.

125.  By way of further example, on or about January 21, 2020, Cerny sent an email from Florida to a Proactive Capital broker, Harry Datys, located in New York, using his doug@primeefs.com domain email address, that attached an engagement letter between the individual and TLS, pursuant to which TLS agreed to pay the consultant a ten percent (10%) "finder's fee" for investment raising plus warrants, Mercadante is copied at his john@primeefs.com domain email address and is the signatory to the agreement.

126. On or about February 27, 2020, Cerny sent a follow-on email from Florida to the Proactive Capital broker, Harry Datys, located in New York, using his doug@primeefs.com email domain address, that attached a proposed TLS Repricing Notice and Shares for Sale Offer to go to TLS investors.  Cerny directed that the TLS offering materials list his doug@primeefs.com email domain address.

127.  By way of further example, on or about February 12, 2020, Cerny sent an email from Florida to third party investors at GSB Holdings, Inc., using his doug@primeefs.com email domain

address and which copied Mercadante at his john@primeefs.com email domain address, to engage in debt financings with TLS secured by convertible promissory notes and providing wire instructions for TLS at its Chase Bank located within New York at 270 Park Avenue, New York, New York.

128.  By way of further example, on or about March 2, 2020, Mercadante sent an email from Florida to New Jersey, using his john@primeefs.com email domain address, ordering Prime's Chief Financial Officer to wire operating capital from Prime's account to third parties for TLS' debts, including $10,000.00 to Pryor Cashman LLP (attorneys for TLS); and $30,000.00 in referral fee payments to a broker, Harry Datys, for facilitating a transaction in which an investor engaged in a financing with TLS.

129. Despite the tens of millions of dollars of revenue growth, TLS' officers undercapitalized Prime leaving it with sufficient capital only to the extent necessary to maintain Prime's short-term operations.

130.  On or about April 16, 2020, TLS caused Prime to apply for $2,941,212.50 in PPP loans despite that Prime was concurrently generating millions of dollars of quarterly revenue. Upon Prime's receipt of such loan proceeds, Mercadante ordered Prime's Chief Financial Officer to send a series of wires from Prime's operating account to TLS' corporate account that, in the aggregate, were proportionate to the amount of Prime's PPP loan.  Prime conveyed millions of dollars of its assets to TLS at the direction of Mercadante for use as determined by the management of TLS – *not* Prime – and without any consideration to Prime.

131.  Under Mercadante, TLS siphoned critical capital out of Prime leaving it undercapitalized and unable to repay of Prime's PPP loan or other operating expenses of Prime, which caused Prime to default on its PPP loan covenants and to withhold disclosure of such default from Prime's lending institution.

132.  Under Mercadante, TLS caused Prime to unlawfully terminate Mazzola.

133.  Furthermore, in a brazen attempt to avoid liability for the various, unlawful and unjust acts that TLS caused its subsidiary to perpetrate, TLS thereafter shuttered the operations of Prime in order to frustrate Mazzola and other creditors and avoid liability.

134.  Furthermore, as set forth above, TLS' Board and management also issued a series of public filings justifying TLS' termination of Plaintiff's employment *at Prime* and TLS' and Prime's obligation to make any further payments to Plaintiff under the Employment Agreement despite that its former top officer and director had executed same.

135.  By way of further example, on February 25, 2020, Mercadante and Cerny sent emails from Florida to New York using their john@primeefs.com and doug@primeefs.com email domain addresses to TLS' investor relations advisory firm, PCG Advisory, Inc. in New York, and TLS' micro-cap investor relations promoter, Southstring Media Group, located, on information and belief, in the United Kingdom, that Mercadante's and Cerny's contact information for TLS' press releases and other micro-cap investor relations promotions and "spotlight" editorials, should contain only email domain names for Prime, i.e., @primeefs.com.

136. On February 25, 2020, TLS' IT vendor, Axon Consulting Services, LLC, also confirmed that TLS had purchases a TLS domain but had never created TLS email addresses using a TLS email domain.

137. All of the foregoing events are indicia of TLS' complete parental control and dominion, on a day-to-day basis, over Prime's management, operations, business line, revenue and marketing, as well as TLS' commingling of its funds and assets with those of its subsidiary in such a way as to enrich the parent company (and only member of Prime) with the assets and to saddle the subsidiary with the liabilities of the business.

138. The foregoing also demonstrate a complete disregard of all corporate formalities

32

between parent and subsidiary under the leadership of Mercadante and Cerny who also hold all or substantially all of the same critical decision-making roles and/or titles in both entities.

139.  In addition, TLS also publicly marketed itself and Prime as an indivisible business segment from Prime to the investor marketplace.

140.  TLS prepared and actively marketed itself throughout the summer of 2019 to dozens of potential investors in the New Jersey-New York tri-state area for capital raising purposes.  To this end, TLS created a "pitch deck" presentation whereby TLS expressly stated in its marketing materials that it sought to raise capital through a $4,000,000.00 term loan with the proceeds to be used and deployed by TLS for *its* operations and *its* "corporate strategic initiatives" – *not* Prime.

141.  The "pitch deck" marketing materials included Prime's mark but expressly defined the "Company" as TLS, provided EBITDA projections for TLS, stated that TLS operated in a five-state radius, which included New Jersey, New York, Connecticut and Pennsylvania, and expressly represented to prospective investors that Prime is a mere "brand name" of TLS.

142.  Furthermore, as part of TLS' corporate strategic initiatives, in the first quarter of 2019, Mercadante and Cerny travelled into this forum state from Florida  to negotiate contracts – new business opportunities – for TLS, and they did so at Prime's offices.

143.  For example, on or about March 6 and 7, 2019, Mercadante and Cerny each flew from Florida into New Jersey to meet at Prime's network operations center, located in Jersey City, New Jersey, with the ownership and management of another transportation and logistics company, Cranston Trucking Company ("Cranston"), from West Greenwich, Rhode Island.  Mercadante and Cerny sought to acquire Cranston.  Over the course of multiple days, TLS' leadership negotiated with Cranston, toured Prime's offices in Jersey City and Carlstadt, New Jersey and toured the shipping distribution locales of Prime's largest client, Amazon.com, Inc.   The meetings, negotiations and tours with Cranston did *not* occur at TLS' offices in Florida.

144.  Upon information and belief, under the control of TLS, Prime also failed to hold any regular meetings of its member, officers and directors.  TLS' management, however, did travel into New Jersey to oversee Prime's operations.  By way of example, on August 28, 20919, Mercadante and Cerny (as well as TLS' chief operating officer, Michael Grennan) travelled from Florida to New Jersey to review with Plaintiff the operations of Prime.

145.  TLS also utilized Prime to perpetrate the unlawful and fraudulent acts detailed herein against Mazzola.

146.  Under Mercadante, TLS also directed officers of Prime to unlawfully withhold accrued salary from Mazzola and directed officers of Prime to ignore repeated requests from TLS' accounting firm, which was demanding proof of an amended employment agreement for Mazzola in order to justify and properly account for TLS' decision to unlawfully withhold hundreds of thousands of dollars of accrued but unpaid Mazzola salary, *i.e.*, liabilities, pursuant to the Employment Agreement.

147.  As a result of Defendants' wrongful and fraudulent activities, Mazzola is entitled to pierce the corporate veil of Prime and hold its sole member and manager, TLS, responsible for the liabilities of Prime in favor of Mazzola in an amount to be determined at trial, but believed to be not less than approximately $2,000,000.00.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Fraudulent Inducement – Mercadante and Cerny)

148.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

149.  At all relevant times, Mazzola reported directly to Mercadante and Cerny who had the authority and power to terminate Mazzola.

150.  At all relevant times after their hiring, Mercadante and Cerny were responsible for causing Prime to honor its obligations in respect of Mazzola.

34

151. Each of Mercadante and Cerny participated in the decision to dramatically cut Mazzola's salary under the terms of his Employment Agreement, withhold his accrued and unpaid salary and to falsely represent to Mazzola that, if he would agree to delay enforcing his rights under the Employment Agreement against Prime and TLS, Mercadante and Cerny would execute new terms of compensation and employment with Mazzola, including providing certain convertible securities that were convertible into shares of TLS' common stock at a significantly discounted and cashless exercise price.  Indeed, they each represented that this was done and authorized by Prime and its parent, TLS.

152. On or about March 7, 2019, Cerny sent an email from Florida to Plaintiff in New Jersey, using his @primeefs.com email domain address indicating that he intended to meet with Plaintiff and Mercadante at Prime's network operations offices in Jersey City, New Jersey to finalize and memorialize new terms of compensation and employment for Mazzola.

153. On April 2 and 13, 2019, Plaintiff sent an email from New Jersey to each of Mercadante and Cerny, at their @primeefs.com email domain addresses, that Plaintiff was still waiting for the new terms of employment and compensation to be emailed to him.  The same date, Cerny acknowledged same by sending an email from Florida to Plaintiff in New Jersey and copying Mercadante, in Florida (again, all using their @primeefs.com email domain addresses), and TLS' corporate attorney at Pryor Cashman LLP, in New York.

154. On or about May 5, 2019, Cerny sent an email from Florida to Plaintiff in New Jersey, using his doug@primeefs.com email domain address, indicating that he was flying into Newark, New Jersey for operations and personnel meetings on March 7 and 8, 2019 and to review Plaintiff's new terms of compensation and employment for Mazzola as well as other compensation for Prime personnel.

155. Mercadante and Cerny continued to represent to Plaintiff that new terms of

employment and compensation were ready for execution, but they withheld presenting a new agreement to Plaintiff.

156.  On or about September 25, 2019, Plaintiff and Mercadante agreed to add into a new employment agreement additional non-compensation terms, because the Employment Agreement was still the only and operative contractual agreement between TLS and Prime, on the one hand, and Plaintiff, on the other hand.  That day, Plaintiff confirmed same in an email to Cerny at his doug@primeefs.com email domain address.  Notably, neither Cerny nor Mercadante disputed that the Employment Agreement was still a valid and enforceable contractual agreement.

157.  On September 26, 2019, Mercadante sent an email from Florida to Plaintiff in New Jersey, using his john@primeefs.com email domain address, requesting that discuss further the proposed, new terms of employment.   Again Mercadante did not dispute that Employment Agreement was still a valid and enforceable contractual agreement.

158.  On or about April 1, 2020, while in Florida, Mercadante called Plaintiff in New Jersey and demanded that Plaintiff further delay enforcing his contractual rights under the Employment Agreement for three (3) additional months.

159.  Unbeknownst to Mazzola, neither Mercadante nor Cerny had any intention of honoring any of the foregoing when they first communicated these false misrepresentations to Mazzola.

160.  It was the intent of each of Mercadante and Cerny, as the top officers and directors of TLS and its wholly-owned subsidiary, Prime, to induce Mazzola to rely upon these misrepresentations and not timely act to enforce his contractual rights, and Mazzola did so to his detriment.

161.  Unbeknownst to Mazzola, Mercadante and Cerny never had the board of TLS or the managers of Prime authorize or approve any new terms of employment or compensation for

Mazzola.

162. At the same time, Mercadante and Cerny increased their respective salaries and secured generous awards of capital stock for themselves.

163. During this same time, Mercadante and Cerny caused Prime to transfer or siphon millions of dollars of operating capital out of Prime's operating account, which otherwise would have paid Mazzola's rising salary as he hit his defined revenue growth milestones for Prime under the Employment Agreement, without consideration to Prime leaving it cash-strapped.

164. Mazzola's reliance was justifiable nonetheless, because he had no reason to believe that the top officers, directors and managers of both parent company and wholly-owned subsidiary (the same individuals) were orchestrating a fraud against Mazzola after Prime and TLS had already breached the Employment Agreement. These were independent events.

165. On June 24, 2020, Plaintiff was terminated.

166. As a direct and proximate result of these actions, Mazzola has sustained damages to be determined at trial.

**WHEREFORE,** Plaintiff demands judgment as follows:

i)      Entry of judgment in his favor in an amount to be determined at trial, but believed to be not less than approximately $2,000,000.00, representing $1,040,000.00 in annualized in salary representing severance under Section 5 of the Employment Agreement; $759,038.41 representing accrued but unpaid salary under Section 3(a) of the Employment Agreement through the date of termination; and all non-cash benefits and services under Sections 3(b)-(i) of the Employment Agreement, plus prejudgment interest and costs against Defendants;

ii)     As a matter of fundamental fairness, piercing the corporate veil of Prime to impose legal liability on on its sole member and parent, TLS, for the legal liabilities it has created and

perpetrated through its complete domination of Prime;

iii)    Entry of judgment against the individual Defendants for perpetrating a fraud upon Plaintiff; and

iv)    That the Court grant Plaintiff such other and further relief as it considers just and proper.

Dated: December 7, 2020

SICHENZIA ROSS FERENCE LLP

By: _____/s/ Owen A. Kloter_____
        Owen A. Kloter, Esq.
        Daniel Scott Furst, Esq., *Pro Hac Vice*
1185 Avenue of the Americas, 37th Floor
New York, New York 10036
(212) 930-9700
okloter@srf.law
sfurst@srf.law

*Attorneys for Plaintiff Frank Mazzola*